IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

**JEANEEN SPINELLI,** an individual,

      Plaintiff,

v.

**MEDSOURCE, INC.**, a Colorado corporation,
**INTANDEM HUMAN RESOURCES, LLC**, a Colorado Limited Liability Company,
**ANDREW MEDVEC**, an individual, and
**MARY JEAN GRADISAR**, an individual,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Jeaneen Spinelli ("**Plaintiff**"), through her undersigned counsel, submits this Complaint and Jury Demand against MEDSource, Inc. ("**MEDSource**"), InTandem Human Resources, LLC ("**InTandem,**" together, "**Defendant Employers**"), Andy Medvec ("**Mr. Medvec**"), and Mary Jean Gradisar ("**Ms. Gradisar**") (collectively, "**Defendants**").

## **PARTIES**

1.      Plaintiff is an individual who resides at 4178 South Crystal Court, Unit 1429, Aurora, Colorado 80014.

2.      Plaintiff is a female.

3.      MEDSource is a Colorado corporation, with its principal place of business located at 7012 S. Revere Parkway, Suite 150, Centennial, Colorado 80112.

4.    MEDSource is a provider of medical equipment for bioskills labs, also known as cadaver labs.

5.    InTandem is a Colorado Limited Liability Company, with its principal place of business located at 650 South Cherry Street, Suite 1221, Denver, Colorado 80246.

6.    InTandem is a Professional Employer Organization that provides human resources, benefits, and payroll support to its clients, including MEDSource.

7.    Andy Medvec is an individual who, upon information and belief, resides at 11903 S. Breeze Grass Way, Parker, Colorado 80134.

8.    Upon information and belief, Mr. Medvec is a co-owner and the Vice President of MEDSource.

9.    Mary Jean Gradisar is an individual who, upon information and belief, resides at 11903 S. Breeze Grass Way, Parker, Colorado 80134.

10.    Upon information and belief, Ms. Gradisar is a co-owner and the President of MEDSource.

11.    Ms. Gradisar and Mr. Medvec are a married couple.

12.    At all relevant times, MEDSource and InTandem jointly employed Plaintiff.

13.    At all relevant times, upon information and belief, Defendant Employers employed at least 15 employees.

## JURISDICTION AND VENUE

14.    Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*. ("**Title VII**") and the Colorado Anti-Discrimination Act, as amended, Colo. Rev. Stat. § 24-34-401, *et seq*. ("**CADA**").

2

15.     This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as such claims arise out of the same case or controversy as Plaintiff's Title VII claims.

17.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b) because the unlawful employment practices and other conduct alleged herein were committed while Plaintiff lived and worked in the judicial district of the United States District Court for the District of Colorado, where, during the relevant time period, Defendants lived, operated their businesses, and continue to operate their businesses.

## JURISDICTIONAL PREREQUISITE

18.     Plaintiff timely filed Charges of Discrimination against MEDSource and InTandem with the Colorado Civil Rights Division (the "CCRD") and the Equal Employment Opportunity Commission (the "EEOC").  Plaintiff requested and received her Notice of Right to Sue letters, mailed on January 23 and 24, 2017 (CCRD) and March 1, 2017 (EEOC).  Plaintiff has fulfilled all conditions precedent to instituting this lawsuit, as necessary, and has otherwise exhausted her administrative remedies.

## GENERAL ALLEGATIONS

### *Employer and Employee Information*

19.     Prior to her work for Defendants, Plaintiff had more than twenty successful years as a business consultant and small business owner with in-depth knowledge of business finance and planning.

3

20.    On or about June 22, 2015, Defendants hired Plaintiff as a part time Operations Coordinator, a new position at MEDSource.

21.    Pursuant to Defendants' offer of employment, Plaintiff executed an Employment Agreement and a Confidentiality Agreement with MEDSource.

22.    Pursuant to Defendants' offer of employment, Plaintiff also executed a Co-Employment Understanding and Agreement with InTandem that, among other things, acknowledged Plaintiff's status as a "co-employee of InTandem HR."

23.    On or about September 1, 2015, Plaintiff began working full time for Defendants.

24.    Throughout her employment, Plaintiff performed her duties in a satisfactory or above average manner.

25.    Plaintiff was fired on March 7, 2016.

### *Defendants' Employee Handbook*

26.    In 2015, Defendants revised the Employee Handbook for Employees of MEDSource, Inc. and InTANDEM Human Resources (the "Employee Handbook").

27.    Plaintiff was provided with a copy of the Employee Handbook when she was hired by Defendants.

28.    Among other things, the Employee Handbook expressly states that "MEDSource is committed to a work environment in which all individuals are treated with respect and dignity."

29.    The Employee Handbook specifically prohibits "any form of unlawful employee harassment" and outlines a complaint procedure.

4

30.     The Employee Handbook's complaint procedure encourages those "who believe they have been victims of [prohibited] conduct" . . . "[to] discuss their concerns with their immediate supervisor, the HR Director of InTandem or any member of management."

31.     The Employee Handbook's complaint process encourages those who are being subjected to unlawful conduct to "promptly advise the offender that his or her behavior is unwelcome and request that it be discontinued," and provides that "[o]ften this action alone will resolve the problem."

32.     The Employee Handbook provides that "[a]ny reported allegations of harassment, discrimination, or retaliation will be investigated properly."

33.     The Employee Handbook provides that "MEDSource prohibits retaliation against any individual who reports discrimination or harassment."

### *Mr. Medvec's Unlawful Harassment*

34.     Shortly after beginning work at MEDSource, Plaintiff was invited to lunch by Mr. Medvec.  Mr. Medvec told Plaintiff that he takes all new employees out for lunch.

35.     During the meal, Mr. Medvec began talking about womens' clothes and how one particular female MEDSource employee dressed.  He said she wore "Friday night special" short skirts, "hooker heels," and wore dresses that were unflattering for her body type.

36.     Plaintiff asked whether Mr. Medvec's concerns about this employee were related to MEDSource's dress code.  Mr. Medvec responded by saying that Ms. Gradisar handled issues related to the dress code and then continued making comments about the female employee's attire and body type.

37.      Over the next several days, Plaintiff saw a pattern emerging – Mr. Medvec consistently made comments and so-called "jokes" about womens' clothing and body types to employees and in the workplace.

38.      In late July 2015, Defendants fired the particular female employee Mr. Medvec talked about to Plaintiff during their first lunch.

39.      After that, Mr. Medvec turned the attention of "jokes" to Plaintiff, her body, and her clothes.

40.      Mr. Medvec did not make any similar comments about male employee's bodies or clothes.

41.      In or about August 2015, Plaintiff spoke with her supervisor, Ms. Gradisar, about Mr. Medvec's comments about her body and clothes, expressing her discomfort.

42.      Ms. Gradisar responded that Mr. Medvec was "harmless," and admitted that his "jokes" can be an "HR nightmare."

43.      Ms. Gradisar also told Plaintiff she would address Plaintiff's concerns with Mr. Medvec, but because Mr. Medvec owned the business, he was unlikely to change.

44.      Mr. Medvec's comments about Plaintiff's clothes and body in fact continued. Though he was not in the office every day, Mr. Medvec made these sorts of comments each day he was in the office.

45.      Neither Mr. Medvec nor Ms. Gradisar ever reference Defendants' dress code in relation to Plaintiff's clothes or body.

46.      Plaintiff was never disciplined nor counseled for any alleged failure to abide by any of Defendants' policies, including its dress code.

47.     At times, Mr. Medvec's comments were focused on specific pieces of clothing Plaintiff owned and the combinations in which she wore them.  For example, Mr. Medvec commented one day that the last time Plaintiff wore those particular pants she was wearing them with different shirt, and then he described the other shirt.

48.     This scrutiny, wholly unrelated to her work, caused Plaintiff extreme distress on a daily basis as she dressed for work, trying to avoid pieces in her wardrobe that drew certain comments, such as the sweater Mr. Medvec said "shrunk," or the blue pants that Mr. Medvec said made her look thinner than she did in her black pants, and so on.

49.     At other times, Mr. Medvec's comments were about Plaintiff's body.  For example, Mr. Medvec commented about how Plaintiff was gaining weight and so she would soon have to buy new clothes to wear to work and that she would likely "bottom out" while driving a sports car.

50.     Another category of comments were those aimed at Plaintiff's personal life.  For example, Mr. Medvec commented that Plaintiff might actually be able to find a man if she wore dresses instead of pants all the time and stated that she wore pants so often that she was probably "one of the guys" and "played for the other side," suggesting Plaintiff might be homosexual.

51.     Mr. Medvec often made these comments in front of other employees, including Plaintiff's supervisor, Ms. Gradisar, who often laughed and rolled her eyes in response.

52.     Mr. Medvec also made comments in the workplace about women in general including telling "jokes" that included derogatory terms used to describe women, relaying a story about how he believed he "assisted" a woman in a department store by telling her how nice she looked in the clothes she was trying on, and frequently offered his opinions about women on

7

television and the clothes they wore, including a newscaster on Denver television.  Mr. Medvec's frequent diatribes about womens' clothing often included comments about women's breasts and the necklines of the clothes they were wearing.  Ms. Gradisar again told Plaintiff she would address Plaintiff's concerns with Mr. Medvec.

53.     In October 2015, Plaintiff again discussed her extreme discomfort with Mr. Medvec's attention to her body in a discussion with Ms. Gradisar, who laughed in response, telling Plaintiff that's just how Mr. Medvec is and that, because MEDSource is Mr. Medvec's company, if she wanted to work there, she would have to understand that.

54.     Later in October 2015, Plaintiff addressed the comments directly with Mr. Medvec, explaining how uncomfortable his comments made her.  Mr. Medvec laughed in response and said he was "just joking."  Mr. Medvec's comments continued.

55.     In November 2015 following a birthday celebration for Mr. Medvec during work hours, in front of a third employee, Mr. Medvec held up two balloons to his chest and, after calling Plaintiff by name, said "I like to play with big balloons, they are so fun."

56.     During another birthday celebration in early December, a fellow coworker complained to Mr. Medvec that having birthday cake would not help that coworker's weight problem.  Mr. Medvec's response, in front of the group, was again to call Plaintiff by name and say, "if you want to see a weight problem, just look at [Plaintiff] sideways."  Humiliated, Plaintiff left the party.

57.     Plaintiff confronted Mr. Medvec, asking him why he felt the need to embarrass her in front of people.  He responded that singling her out made others feel better, and he felt it was not an inappropriate thing to say because it was a true statement.

8

58.     Later that same day, Plaintiff again discussed the issue with Ms. Gradisar. Plaintiff notified Ms. Gradisar that she intended to again confront Mr. Medvec about his conduct.

59.     Ms. Gradisar acknowledged the severity of the issue and told Plaintiff that no one should have to work in an environment that made them feel the way Plaintiff felt.  Ms. Gradisar also told Plaintiff that she was aware the company could be sued because of the comments Mr. Medvec was making, and insisted that Plaintiff not confront Mr. Medvec, but wait for Ms. Gradisar to schedule a meeting so the three of them could sit down to discuss.  Such a meeting never occurred.

60.     On or about December 14, 2015, after returning from previously-scheduled time off, Plaintiff noticed a drastic change in Mr. Medvec's and Ms. Gradisar's behaviors toward her.

61.     Mr. Medvec began avoiding Plaintiff.

62.     Before, Plaintiff and Ms. Gradisar spent a good deal of time working together and generally got along.  After Plaintiff's complaint in early December, Ms. Gradisar started avoiding interactions with Plaintiff and her demeanor became standoffish toward Plaintiff.

63.      During a meeting between Plaintiff and Ms. Gradisar on or about Friday, December 18, 2015, Ms. Gradisar brought up the issue of Mr. Medvec's comments and told Plaintiff that Mr. Medvec was waiting for Plaintiff to approach him so the two could discuss the situation.  Ms. Gradisar then insinuated that Plaintiff had caused the problem by participating in the "joking" early on in her employment.

64.     Plaintiff told Ms. Gradisar that situations like the one Plaintiff found herself in are why people often do not report workplace harassment.  Plaintiff explained that, in her

9

experience, issues of workplace harassment are rarely resolved and that the person who made the complaint ends up feeling like the problem.

65.       During MEDSource's holiday party on or about December 23, 2015, Ms. Gradisar presented Mr. Medvec with a squirt bottle, the sort used to spray water on plants.

66.       The bottle had a label on it that said "Andy," Mr. Medvec's first name.

67.       While presenting the bottle to Mr. Medvec, Ms. Gradisar advised employees that whenever Mr. Medvec got "out of line," the employees should squirt him with the bottle.

68.       Defendants also gave employees individual gifts that day.  Plaintiff received cash and a Macy's gift card.

69.       Mr. Medvec commented that he hoped Plaintiff would use the gift card to buy clothes that fit.

70.       Later that day as she was leaving the office, Mr. Medvec called Plaintiff into the conference room and initiated a conversation about Plaintiff's complaints, wondering what exactly he had done or said that offended Plaintiff.

71.       Plaintiff responded that she wanted Mr. Medvec to stop making her the object of his "jokes," including "jokes" about her body and clothes.

72.       During a meeting on December 29, 2015, Ms. Gradisar asked Plaintiff how things were going with Mr. Medvec and told Plaintiff in a serious tone that Plaintiff should use the squirt bottle on Mr. Medvec whenever he made inappropriate "jokes" or comments.

73.       After returning to work following the New Year holiday, Mr. Medvec continued to avoid Plaintiff and Plaintiff's relationship with Ms. Gradisar became even more strained.

10

74.    In early 2016, Mr. Medvec and Ms. Gradisar were out of the office for a week.

75.    During their absence, a MEDSource employee told Plaintiff that Mr. Medvec said he was no longer allowed to "make fun" of Plaintiff and that is why he is not spending as much time in the office.

76.    Following their return from vacation, Mr. Medvec and Ms. Gradisar seemed to further isolate Plaintiff – leaving her out of decision-making and communication processes, even for areas under her direct supervision.

77.    Thereafter, Ms. Gradisar re-focused Plaintiff's work and responsibilities, saying she wanted less communication with Plaintiff.

78.    During one meeting, however, Ms. Gradisar told Plaintiff that other employees had also complained about Mr. Medvec's "jokes" and comments.  Ms. Gradisar then stated that she needed to adjust her "Andy filter" because she felt she was used to his statements, which did not strike her as inappropriate.

79.    Mr. Medvec's comments about Plaintiff continued when he was present in the office.  For example, Mr. Medvec commented to visitors to the office that Plaintiff complained about the temperature of her office because she was "flashing" with hormones and asked her why she would buy the sweater she was wearing because it "enhanced" her "back end."

80.    After months of enduring continued poor treatment from both Mr. Medvec and Ms. Gradisar, Plaintiff was fired on March 7, 2016.  Ms. Gradisar told Plaintiff that her services were no longer needed.

11

**FIRST CLAIM FOR RELIEF**
**Discrimination and Harassment Based on Gender in Violation of Title VII,**
**42 U.S.C. § 2000e,** *et seq***, and CADA, Colo. Rev. Stat. § 24-34-401,** *et seq*
**Against MEDSource and InTandem**

81.     Plaintiff incorporates each of the allegations set forth above, as if fully set forth herein.

82.     Plaintiff was subjected to unwelcome and offensive harassment and discriminatory conduct based on her gender during her employment with Defendants.

83.     Defendants' unlawful actions against Plaintiff, including Mr. Medvec's harassment of Plaintiff, were because of Plaintiff's gender, resulting in adverse impacts to the terms and conditions of Plaintiff's employment and further subjecting Plaintiff to harassment and a hostile work environment.

84.     This harassment and discriminatory conduct was sufficiently severe and pervasive so as to unreasonably interfere with Plaintiff's health, well-being, and work performance, creating a hostile and offensive working environment.

85.     Further, other female employees complained to Defendants about harassment they had suffered, yet upon information and belief, no corrective action was taken.

86.     Defendants knew or should have known of Mr. Medvec's conduct and failed to take prompt, remedial action to stop his conduct.

87.     In unlawfully discriminating against and harassing Plaintiff, Defendants acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Plaintiff's rights under the law, thereby necessitating the imposition of exemplary damages.

88.     As a result of Defendants' above-described conduct, Plaintiff has suffered loss of income (back pay and front pay), extreme manifestations of emotional distress for which she has, and continues to seek medical help, humiliation, and other damages to be proved at trial.

89.     As a further direct and proximate result of Defendants' unlawful behavior, Plaintiff has been compelled to retain the services of counsel in an effort to assert her rights and has, thereby, incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff.

**SECOND CLAIM FOR RELIEF**
**Retaliation in Violation of Title VII, 42 U.S.C. § 2000e, et seq, and**
**CADA, Colo. Rev. Stat. § 24-34-401, *et seq***
**Against MEDSource and InTandem**

90.     Plaintiff incorporates each of the allegations set forth above, as if fully set forth herein.

91.     During the course of Plaintiff's employment with Defendants, Defendant Employers, by and through their agents and employees including Mr. Medvec and Ms. Gradisar, retaliated against Plaintiff in the terms, conditions, and privileges of her employment.

92.     On multiple occasions, Plaintiff engaged in protected conduct by voicing her concerns about the harassment she was suffering to both her harasser, Mr. Medvec, and to her direct supervisor and MEDSource's co-owner, Ms. Gradisar.

93.     Instead of taking Plaintiff's concerns seriously, Defendants laughed at Plaintiff, blamed her, and began to treat Plaintiff poorly, cutting Plaintiff off from her work and, eventually, terminating her employment.

94.    In unlawfully retaliating against Plaintiff, Defendants acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Plaintiff's rights under the law, thereby necessitating the imposition of exemplary damages.

95.    Because of Defendants' actions, Plaintiff has suffered loss of income (front pay and back pay), emotional distress, and other compensable damages.

96.    As a further direct and proximate result of Defendants' unlawful behavior, Plaintiff has been compelled to retain the services of counsel in an effort to assert her rights and has, thereby, incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff.

### THIRD CLAIM FOR RELIEF
### Promissory Estoppel
### Against MEDSource and InTandem

97.    Plaintiff incorporates each of the allegations set forth above, as if fully set forth herein.

98.    Defendants' promise not to retaliate against Plaintiff for her good faith complaints about Mr. Medvec's harassment was clear and unambiguous as presented in the Employee Handbook.

99.    Plaintiff relied upon Defendants' promise that they would not retaliate against her based on her good faith complaints about Mr. Medvec's harassment.

100.    Defendants breached that promise by retaliating against Plaintiff because of her complaints, including by treating Plaintiff less favorably than before her complaints and by terminating Plaintiff's employment.

101.     As a direct and proximate result of Plaintiff's reasonable reliance upon

Defendants' promise, Plaintiff has suffered damages in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
**Extreme and Outrageous Conduct/Intentional Infliction of Emotional Distress
Against Andrew Medvec**

102.     Plaintiff incorporates each of the allegations set forth above, as if fully set forth

herein.

103.     Mr. Medvec engaged in conduct that was extreme in degree, outrageous in

character, and the sort that a reasonable member of the community would regard as going

beyond all bounds of decency.

104.     This extreme and outrageous conduct arose, in part, because of Mr. Medvec's

knowledge that Plaintiff was particularly susceptible to emotional distress when faced with

comments related to her body type and clothes.

105.     Mr. Medvec was notified by Plaintiff and by Ms. Gradisar that he had offended

Plaintiff by his comments about her body type and clothes.

106.     Despite these warnings, Mr. Medvec's public comments and "jokes" continued

with his knowledge that the comments and "jokes" were causing, or were likely to cause

Plaintiff, severe emotional distress and humiliation.

107.     Mr. Medvec engaged in the extreme and outrageous conduct while the Vice

President and owner of the company Plaintiff worked for, and in front of Plaintiff's coworkers

and other employees.

108.     Mr. Medvec acted recklessly and with the intent of causing Plaintiff severe

emotional distress.

15

109.    Mr. Medvec's conduct did, in fact, cause Plaintiff severe emotional distress.

110.    As a result of Mr. Medvec's actions, Plaintiff suffered severe emotional distress, for which she has, and continues to receive medical treatment.

111.    As a further direct and proximate result of Mr. Medvec's unlawful behavior, Plaintiff has been compelled to retain the services of counsel in an effort to assert her rights and has, thereby, incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff.

**FIFTH CLAIM FOR RELIEF**
**Negligent Supervision**
**Against Mary Jean Gradisar**

112.    Plaintiff incorporates each of the allegations set forth above, as if fully set forth herein.

113.    Ms. Gradisar had a duty to take reasonable steps to protect Defendants' employees from the known risk of harm Mr. Medvec posed in the workplace.

114.    Ms. Gradisar had knowledge of, or should have recognized that, Mr. Medvec's behavior created an undue risk of harm to the employees he encountered while performing his job.

115.    Plaintiff advised Ms. Gradisar that Mr. Medvec's comments and "jokes" about her body type and clothes were offensive and extremely upsetting to her.

116.    Ms. Gradisar had also been advised by at least one other female employee that Mr. Medvec's comments and "jokes" were offensive to that employee, as well.

117.    Ms. Gradisar breached her duty to prevent harm to Defendants' employees when she failed to take reasonable steps to prevent Mr. Medvec's harmful behavior by not addressing

16

the comments Mr. Medvec made in her presence, by ignoring complaints made by employees about Mr. Medvec, and by making light of employees' complaints by telling employees to spray Mr. Medvec with water when he was out of line.

118.    Ms. Gradisar's failure to intervene caused significant damages, including severe emotional distress and humiliation, to Plaintiff.

119.    As a further direct and proximate result of Ms. Gradisar's negligence, Plaintiff has been compelled to retain the services of counsel in an effort to assert her rights and has, thereby, incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for entry of judgment in her favor and against Defendants as follows:

A.    Compensatory damages, including without limitation, back pay, front pay, damages for loss of reputation, loss of opportunity for professional growth, additional financial incidental and consequential damages;

B.    Non-economic damages for emotional distress, pain and suffering, humiliation, inconvenience, mental anguish, loss of reputation, and other non-pecuniary losses;

C.    Liquidated, exemplary, and punitive damages as permitted;

D.    Reasonable attorneys' fees and costs as provided by statute or applicable law;

E.    Pre- and post-judgment interest; and

F.    Such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Dated: April 17, 2017

By:     /s/ *Leah P. VanLandschoot*
Leah P. VanLandschoot, #35723
Amy M. Maestas, #46925
THE LITIGATION BOUTIQUE LLC
1720 S. Bellaire Street, Suite 805
Denver, Colorado 80222
T: 303.355.1942
F: 303.355.2199
lvanlandschoot@thelitbot.com
amaestas@thelitbot.com
**ATTORNEYS FOR PLAINTIFF
JEANEEN SPINELLI**

**Plaintiff's Address:**
4178 South Crystal Court, Unit 1429
Aurora, Colorado 80014